**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TRAVIS VRANA, derivatively on behalf of TELADOC HEALTH, INC., Plaintiff, v. KENNETH H. PAULUS, SANDRA L. FENWICK, CATHERINE A. JACOBSON, DAVID L. SHEDLARZ, MARK D. SMITH, DAVID B. SNOW, JR., J. ERIC EVANS, THOMAS G. MCKINLEY, KAREN DANIEL, WILLIAM H. FRIST, JASON NATHANIALL GOREVIC, and MALA MURTHY, Defendants, and TELADOC HEALTH, INC. Nominal Defendant, | Case No. **DEMAND FOR JURY TRIAL** |

# VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Travis Vrana ("Plaintiff"), by and through his undersigned attorneys, brings this Verified Shareholder Derivative Complaint (the "Complaint") behalf of nominal defendant Teladoc Health, Inc. ("Teladoc" or the "Company"), against the Individual Defendants (defined herein, and together with Teladoc, the "Defendants") for breaches of fiduciary duties as directors and/or officers of Teladoc, unjust enrichment, waste of corporate assets, and for violations of Section 14(a) of the Securities and Exchange Act of 1934 (the "Exchange Act") and Rule 14a-9 promulgated thereunder, and against defendants Jason Nathaniall Gorevic ("Gorevic") and Mala Murthy ("Murthy") for contribution under Sections 10(b) and 21D of the Exchange Act.

Plaintiff's allegations are based upon a review of publicly available information, including filings by Teladoc with the U.S. Securities and Exchange Commission (the "SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, including the Amended Complaint for Violations of the Federal Securities Laws filed on February 24, 2025 (the "Securities Complaint") in the (partially) sustained federal securities fraud class action captioned *Stary v. Teladoc Health, Inc., et al.,* Civil Action No. 7:24-cv-03849-KMK (S.D.N.Y.) (the "Securities Action"), and other matters of public record. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. As a direct and proximate result of the Individual Defendants' misconduct, the Company has been damaged. Plaintiff seeks to remedy those damages by this complaint.

## INTRODUCTION

1. This is a shareholder derivative action brought by Plaintiff on behalf of nominal defendants Teladoc against certain current and former senior officers of Teladoc and members of the Company's Board of Directors (the "Board"). This derivative action arises from breaches of

their fiduciary duties of loyalty, candor, and good faith and other violations of law, in connection with the Individual Defendants causing, approving, and/or acquiescing in the Company's issuance of false and misleading statements, as well as failing to disclose material adverse facts about the Company's business, operations, and prospects between April 11, 2023 and February 20, 2024 (the "Relevant Period").

2. Teladoc, a Delaware corporation headquartered in New York City, is a virtual healthcare company which operated under two business segments during the Relevant Period. Analysts and stockholders viewed one of those segments – BetterHelp – as the Company's principal driver of revenue and adjusted earnings before interest, taxes, depreciation, and amortization ("EBITDA") growth in fiscal year 2023 ("FY23").

3. BetterHelp sells virtual mental health services directly to consumers. As such, BetterHelp heavily relied on advertising and marketing expenditure to achieve revenue, adjusted EBITDA, and paying user growth before and during the Relevant Period. Because it was critically important for the Individual Defendants to understand the yield that BetterHelp was generating on its ad spend – which the Individual Defendants admit they tracked on a daily, and even hourly, basis – analysts and stockholders paid careful attention to BetterHelp's ad spend yield. Ad spend yield was assessed at the Company by calculating BetterHelp's customer acquisition costs before and during the Relevant Period.

4. Before and during the Relevant Period, the Individual Defendants disclosed to analysts and stockholders that: (1) Teladoc purposely manipulated ad spending during each fiscal year so that BetterHelp would perform in a predictable pattern to account for increased ad expenses during the holiday season; and (2) BetterHelp's performance in FY23 would align with this planned seasonal pattern.

5. According to the Individual Defendants, BetterHelp would maintain ad spending levels in the second quarter ("Q2") and third quarter ("Q3") of each year, which led to predictable revenue, adjusted EBITDA, and paying user growth in those quarters. But in the fourth quarter ("Q4"), because holiday season ads are more expensive, BetterHelp would reduce its ad spend. This caused increased adjusted EBITDA in Q4 (since ad spend is a cost), and the same level of revenue and paying user growth as in Q3 due to the lag in time between the reduction in ad spending and new growth. In the first quarter ("Q1"), BetterHelp would ramp ad spending back up to Q2 and Q3 levels, causing decreased adjusted EBITDA in Q1. Revenue and paying user growth would also decrease in Q1 due to the lag between the acceleration in ad spending and new growth.

6. BetterHelp's planned seasonality could be disrupted, however, if ad spend yield declined due to increased customer acquisition costs. That is precisely what occurred at BetterHelp in fiscal year 2022 ("FY22"), when temporary increases in customer acquisition costs in the social media advertising channel (and another advertising channel) were caused by upstart competitors who were pursuing growth at all costs. As a result, in FY22 BetterHelp did not follow the planned seasonal pattern in the first quarter of 2022 ("1Q22") or the second quarter of 2022 ("2Q22"), which caused BetterHelp's adjusted EBITDA to materially decline in those fiscal quarters. Because of the temporary increase in customer acquisition costs in FY22, analysts and investors were highly attuned to any increase in those costs in FY23.

7. Indeed, BetterHelp's ad spend yield in the social media channel was particularly material to stockholders because on July 14, 2023, the Federal Trade Commission (the "FTC") gave final approval to an order requiring BetterHelp to pay $7.8 million to its customers – individuals who sought mental health treatment – for allegedly stealing their private health data.

The reason BetterHelp allegedly did this was to give that data to social media companies, like Facebook, to improve the effectiveness (thereby reducing the cost) of BetterHelp's ad spend in the social media channel, *i.e.*, to reduce BetterHelp's customer acquisition costs. Although BetterHelp supposedly voluntarily stopped this practice in 2021 after it was uncovered by reporters, BetterHelp was not barred by the FTC from engaging in this misconduct until July 14, 2023.

8. During the Relevant Period, the Individual Defendants issued a series of materially false and misleading statements and omissions to stockholders regarding BetterHelp's customer acquisition costs and planned seasonal performance. Unbeknownst to stockholders, however, by the beginning of the third quarter of 2023 ("3Q23"), on July 1, 2023, BetterHelp's customer acquisition costs in the social media channel had materially increased because BetterHelp had saturated that channel. Thus, BetterHelp's ad spend in the social media channel had become significantly more expensive, thereby, materially reducing profits.

9. On October 24, 2023, the Individual Defendants publicly presented Teladoc's 3Q23 financial results and acknowledged "a modest deterioration" in BetterHelp's ad spend yield and related declines in BetterHelp's paying users and adjusted EBITDA, which led to a nearly 4% decline in Teladoc's common stock price. Nonetheless, the Individual Defendants continued to mislead stockholders by falsely representing, among other things, that BetterHelp's purported minor decrease in ad spend yield (meaning increase in customer acquisition costs) in 3Q23 was not a material threat to BetterHelp's planned performance in the fourth quarter of 2023 ("4Q23") or fiscal year 2023 ("FY24") – and that BetterHelp's ad spend could still yield acceptable levels of profit – which was not true in the social media channel.

10. The Individual Defendants continued to make similar materially false and misleading statements and omissions to stockholders in November 2023 and January 2024.

11. On February 20, 2024, the Individual Defendants publicly presented Teladoc's 4Q23 and FY23 financial results and acknowledged the full extent of the negative impact caused by BetterHelp's materially increased customer acquisition costs. The Individual Defendants admitted that: (1) BetterHelp had started experiencing materially increased customer acquisition costs by the beginning of 3Q23, *i.e.*, by July 1, 2023; (2) these materially increased costs were specific to the social media channel; and (3) BetterHelp's additional ad spend in the social media channel was causing significantly diminished profits. In response, Teladoc's common stock price declined by approximately ***24%***.

12. Less than two months later, on April 5, 2024, defendant Gorevic, who had served as the Company's Chief Executive Officer ("CEO") and a Board member since 2009, was fired. Analysts linked defendant Gorevic's firing to Teladoc's February 20, 2024 stock price decline and BetterHelp's related financial underperformance in 3Q23 and 4Q23.

13. Further, in 2024, the Securities Action was initiated by investors against the Company. The operative Securities Complaint was subsequently filed on February 24, 2025, and asserted federal securities fraud claims against Teladoc, defendant Gorevic, and defendant Murthy, the Company's then-Chief Financial Officer ("CFO") on behalf of a class of investors who purchased Teladoc shares between July 26, 2023 and February 20, 2024 (the "Class Period").

14. On March 31, 2026, U.S. District Judge Kenneth M. Karas ("Judge Karas") issued an Opinion and Order denying the defendants' motion to dismiss the Securities Complaint (in material part). Therein, Judge Karas concluded that a number of the defendants' public statements during the Class Period that had been challenged in the Securities Complaint were sufficiently alleged to have been materially false and misleading, and that there was an inference of scienter. Stated another way, Judge Karas found there was *indicia* that defendants Gorevic and Murthy

participated in a scheme to defraud Teladoc investors during the Class Period. Accordingly, the Securities Action against Teladoc is now proceeding towards trial.

15. Due to the Individual Defendants' serious misconduct—which has subjected the Company to the (partially) sustained Securities Action, the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

16. Due to the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)), SEC Rule 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder, Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b), 78t(a) and 78t-1), SEC Rule 10b5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)).

Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Action based on violations of the Exchange Act.

18. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

19. This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

20. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because: (i) the Company maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein occurred in this District; and (iv) the Individual Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

21. In connection with the acts, transactions, and conduct alleged herein, the Individual Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## THE PARTIES

22. Plaintiff is a current shareholder of Teladoc and has continuously held shares of Teladoc common stock since November 2020.

23. Nominal defendant Teladoc is a Delaware corporation headquartered in New York City. According to its public filings, Teladoc is a virtual healthcare company focused on providing customers with healthcare access through telehealth visits. Teladoc's common stock is traded on the New York Stock Exchange ("NYSE") under the symbol "TDOC."

24. Defendant Kenneth H. Paulus ("Paulus") has served as a member of the Board since 2017.

25. Defendant Sandra L. Fenwick ("Fenwick") has served as a member of the Board since 2020.

26. Defendant Catherine Jacobson ("Jacobson") has served as a member of the Board since 2020. Defendant Jacobson also served during the Relevant Period as a member of the Board's Audit Committee (the "Audit Committee")

27. Defendant David L. Shedlarz ("Shedlarz") has served as a member of the Board since 2016. Defendant Shedlarz also served during the Relevant Period as a member of the Audit Committee.

28. Defendant Mark D. Smith ("Smith") has served as a member of the Board since 2018.

29. Defendant David B. Snow, Jr. ("Snow") has served as a member of the Board since 2014.

30. Defendant J. Eric Evans ("Evans") served on the Board from September 2023 until February 2026. During the Relevant Period, defendant Evans served as a member of the Audit Committee.

31. Defendant Thomas G. McKinley ("McKinley") served on the Board from 2009 until February 2026. During the Relevant Period, defendant McKinley served as a member of the Audit Committee.

32. Defendant Karen Daniel ("Daniel") served as a member of the Board from November 2020 until May 2024. During the Relevant Period, defendant Daniel served as a member of the Audit Committee.

33. Defendant William H. Frist ("Frist") served as a member of the Board from 2014 until May 2023.

34. Defendant Gorevic served as a member of the Board and as the Company's CEO from 2009 until April 5, 2024. Defendant Gorevic is a named individual defendant in the Securities Action and has had federal securities fraud claims sustained against him in that case.

35. Defendant Murthy served as Teladoc's CFO from 2019 until November 2025. Defendant Murthy is a named individual defendant in the Securities Action and has had federal securities fraud claims sustained against her in that case.

36. Defendants Paulus, Fenwick, Jacobson, Shedlarz, Smith, Snow, Evans, McKinley, Daniel, Frist, Gorevic, and Murthy are collectively referred to herein as the "Individual Defendants."

**DUTIES OF THE INDIVIDUAL DEFENDANTS**

37. By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its stockholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were, and are, required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of the Company and its stockholders so as

to benefit all stockholders equally and not in furtherance of their personal interests or benefit. Each director and officer owed to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

38. The Individual Defendants, because of their positions of control and authority as directors and/or officers, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

39. At all times relevant hereto, each of the Individual Defendants was the agent of the other Individual Defendants and of the Company and was at all times acting within the course and scope of such agency.

40. To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the Individual Defendants were required to, among other things:

a. manage, conduct, supervise and direct the business affairs of the Company in accordance with all applicable laws;

b. neither violate, nor knowingly permit any officer, director or employee of the Company to violate, applicable laws, rules and regulations;

c. establish and maintain systematic and accurate records and reports of the business and affairs of the Company and procedures for the reporting of the business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

d. neither engage in self-dealing, nor knowingly permit any officer, director or employee of the Company to engage in self-dealing;

e. ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

f. conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

g. ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times; and

h. remain informed regarding how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

41. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and its stockholders the fiduciary duties of loyalty, good faith, the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants alleged herein involves a violation of their obligations as directors and/or officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its stockholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company. The conduct of the Individual

Defendants, who were also officers and/or directors of the Company, has been ratified by the remaining defendants.

42. Per its Charter, the purpose of the Audit Committee is to assist the Board in, among other things, its oversight of the integrity of the Company's financial statements and the Company's compliance with legal and regulatory requirements.

43. Per its Charter, the Audit Committee's specific duties include, among other things, (i) reviewing and discussing the annual audited financial statements in Teladoc's Annual Reports on SEC Form 10K with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations"; (ii) providing the Company with the report of the Audit Committee with respect to the audited financial statements for inclusion in each of the Company's annual proxy statements; (iii) reviewing and discussing the quarterly financial statements in Teladoc's Quarterly Reports on SEC Form 10-Q with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations"; (iv) discussing the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies; and (v) reviewing and overseeing the Company's compliance with risk management policies and procedures, including, but not limited to, Teladoc's Code of Business Conduct and Ethics (the "Ethics Code").

44. The Company's Ethics Code specifically applies to all officers and directors of Teladoc. Pursuant to the Ethics Code, the Individual Defendants were and are required to, among other things, (i) conduct business affairs with honesty and in full compliance with all applicable laws, rules, and regulations; (ii) not act in disregard of Company policies or engage in unethical dealings in connection with the Company's business; (iii) comply with their fiduciary duty to act

in the best interests of Teladoc; and (iv) provide full and accurate information in the Company's public disclosures, including its SEC filings, in all material respects, about the Company's financial condition and results of operations.

## FACTUAL ALLEGATIONS

### Teladoc and Its Business

45. According to its public filings, Teladoc is a "global leader in whole person virtual care[.]" Essentially, Teladoc contracts with a professional association, which in turn contracts with physicians to provide virtual healthcare services through Teladoc's technology platform.

46. The Company primarily generates revenue and profit (*i.e*., adjusted EBITDA) by selling access to virtual healthcare to its customers, which ranges from hospitals and health systems (*i.e*., business-to-business) to individual consumers (*i.e*., direct-to-consumer).

47. According to Teladoc's Annual Report on Form 10-K for FY23 (the "2023 Form 10-K"), which was filed with the SEC on February 23, 2024, and signed by defendants Gorevic, Murthy, Snow, Daniel, Evans, Fenwick, Jacobson, McKinley, Paulus, Shedlarz, and Smith, during the Relevant Period the Company was organized into two reporting segments: (1) BetterHelp, which is the Company's mental health direct-to-consumer platform; and (2) Integrated Care, which is the Company's business-to-business division.

### BetterHelp's Revenue, Adjusted EBITDA, and Paying User Performance Was Highly Material to Stockholders Before and During the Relevant Period

48. BetterHelp, which was acquired by Teladoc in 2015 for $3.5 million in cash and a $1 million promissory note, focuses on selling virtual mental health services directly to individual consumers.

49. By January 1, 2023, BetterHelp accounted for a significant portion of the Company's revenue and profit. For this reason, analysts and stockholders paid careful attention to

BetterHelp's financial performance in terms of revenue, adjusted EBITDA, and paying users before and during the Relevant Period in FY23.

50. Before FY23, the Company's public filings did not provide stockholders with segment-level reporting information on BetterHelp. Thus, Teladoc's pre-FY23 SEC filings do not specify the precise amount of revenue, adjusted EBITDA, or paying users directly attributable to BetterHelp.

51. That changed in FY23, as confirmed by Teladoc's Annual Report on Form 10-K for FY22 (the "2022 Form 10-K"), which was filed with the SEC on March 1, 2023, and signed by defendants Gorevic, Murthy, Snow, Daniel, Evans, Fenwick, Frist, Jacobson, McKinley, Paulus, Shedlarz, and Smith.

52. The 2022 Form 10-K stated that "[i]n the fourth quarter of 2022, [Teladoc] adopted a new organizational and reporting structure based on two operating segments, Teladoc Health Integrated Care ('Integrated Care') and BetterHelp."

53. According to the 2022 Form 10-K, BetterHelp's revenue for FY22 was $1,012,574,000, which accounted for approximately 42% of Teladoc's revenue for FY22.

54. According to the 2022 Form 10-K, BetterHelp's adjusted EBITDA for FY22 was $114,116,000, which accounted for approximately 46.3% of Teladoc's adjusted EBITDA for FY22.

55. According to the 2022 Form 10-K, as of December 31, 2022, BetterHelp had 420,000 paying users. This represented an increase of 37% versus December 31, 2021, when BetterHelp had 310,000 paying users.

56. The 2022 Form 10-K explains that "BetterHelp paying users represent the global number of paid users who used our BetterHelp mental health services during the applicable period.

***We believe that our ability to add new paying users and retain existing users is a key indicator*** of the increasing market adoption of BetterHelp, the growth of that business, and future revenue potential."

57. According to Teladoc's Quarterly Report on Form 10-Q for the fiscal quarter ended March 31, 2023 ("1Q23"), which was filed with the SEC on May 2, 2023, and signed by defendants Gorevic and Murthy (the "1Q23 Form 10-Q"), BetterHelp's revenue for 1Q23 was $279,272,000, which accounted for approximately 44.4% of Teladoc's revenue for 1Q23.

58. According to the 1Q23 Form 10-Q, BetterHelp's adjusted EBITDA for 1Q23 was $17,638,000, which accounted for approximately 33.5% of Teladoc's adjusted EBITDA for 1Q23.

59. According to the 1Q23 Form 10-Q, as of March 31, 2023, BetterHelp had 470,000 paying users. This represented an increase of 22% versus the quarter ended March 31, 2022 ("1Q22"), when BetterHelp had 380,000 paying users.

60. According to the 2Q23 Form 10-Q – filed shortly after the start of the Relevant Period commences – BetterHelp's revenue for 2Q23 was $292,356,000, which accounted for approximately 44.8% of Teladoc's revenue for 2Q23.

61. According to the 2Q23 Form 10-Q, BetterHelp's adjusted EBITDA for 2Q23 was $34,187,000, which accounted for approximately 47.8% of Teladoc's adjusted EBITDA for 2Q23.

62. According to the 2Q23 Form 10-Q, as of June 30, 2023, BetterHelp had 476,000 paying users. This represented an increase of 17% versus the quarter ending June 30, 2022 ("2Q22"), when BetterHelp had 408,000 paying users.

63. BetterHelp's 476,000 paying users in 2Q23 – just before the start of the Relevant Period – was the largest amount of paying users BetterHelp achieved in either FY22, or during or after the Relevant Period.

64. The Individual Defendants publicly emphasized that BetterHelp's financial performance was critical to Teladoc and, thereby, to the Company's stockholders. For example, during a July 27, 2022 conference call with analysts and stockholders to present Teladoc's 2Q22 financial results (the "July 2022 Conference"), defendant Murthy stated that "as we have given you more color and transparency into [the] size of [BetterHelp] and the growth of [BetterHelp], ***it is more material***."

65. Likewise, before and during the Relevant Period, analysts routinely stated that BetterHelp was key to Teladoc's revenue and profit growth in FY23. For example, RBC Capital Markets stated in a February 22, 2023 report on Teladoc that "BetterHelp should continue to drive the majority of growth and profitability in '23." In addition, Needham stated in a February 23, 2023 report on Teladoc that "BetterHelp represent[s] the growth and profit engine next year . . . growth will primarily come from BetterHelp."

66. Accordingly, by the start of the Relevant Period, analysts and stockholders closely followed BetterHelp's revenue, adjusted EBITDA, and paying user performance, including the drivers of that performance – *i.e.*, BetterHelp's ad spend yield and the related customer acquisition costs.

**Stockholders Were Highly Attuned to BetterHelp's Customer Acquisition Costs and Related Ad Spend Yield Before and During the Relevant Period**

67. Because BetterHelp is a direct-to-consumer business, before and during the Relevant Period, Teladoc expended significant sums on advertising and marketing costs designed to grow and maintain BetterHelp's business by attracting new customers, or "users."

68. According to the 2022 Form 10-K, signed by defendants Gorevic, Murthy, Snow, Daniel, Evans, Fenwick, Frist, Jacobson, McKinley, Paulus, Shedlarz, and Smith, Teladoc "sell[s] our BetterHelp services principally through marketing our solution directly to potential users."

69. The 2022 Form 10-K further states that Teladoc's spending on advertising and marketing increased 50% in FY22 versus the fiscal year ended December 31, 2021 ("FY21"), amounting to $623.5 million in advertising and marketing expenditure for FY22, which "was substantially driven by higher digital and media advertising in support of BetterHelp[.]"

70. According to the 2023 Form 10-K, signed by defendants Gorevic, Murthy, Snow, Daniel, Evans, Fenwick, Jacobson, McKinley, Paulus, Shedlarz, and Smith, Teladoc's spending on advertising and marketing increased 10% in FY23 versus FY22, amounting to $688.9 million for FY23, which "was substantially driven by higher digital and media advertising costs related to BetterHelp."

71. The Individual Defendants repeatedly told stockholders that advertising and marketing expenditures were made for BetterHelp through, among other channels, the social media channel, *i.e.*, Facebook and similar social media services. For example, the 2022 Form 10-K explained that, as part of BetterHelp's advertising and marketing efforts, the Company "rel[ies] on relationships for our BetterHelp business with . . . social networking platforms such as Facebook[.]"

72. According to the FTC Complaint (defined below), by 2021 BetterHelp was heavily using Facebook advertising, and was bringing in approximately 30,000 to 40,000 new users per quarter through Facebook advertising.

73. Companies measure the effectiveness of advertising and marketing expenditure by tracking customer acquisition costs (sometimes referred to herein as "CAC"), which is a non-Generally Accepted Accounting Principles ("GAAP") financial metric that represents the average cost to a company associated with acquiring a new customer.

74. CAC is commonly understood to be calculated as: (1) advertising and marketing expenditure for a given period; divided by (2) new customers acquired in that period. For example:




75. CAC is a critical performance metric for growth businesses like BetterHelp because CAC measures the profitability of a business as it grows. Lower customer acquisition costs indicate that a business is obtaining a good yield, or profit, on advertising and marketing expenditures. Conversely, higher customer acquisition costs indicate that a business is generating a poor or low yield on advertising and marketing expenditures.

76. If a business is generating a low yield on advertising and marketing expenditure, then it must spend a greater amount on advertising and marketing expenditure to maintain or exceed the prior growth rate, thereby reducing profit.

77. In order for a business like BetterHelp to grow or maintain profitability, Teladoc had to ensure a high yield on the Company's advertising and marketing expenditure, meaning the Individual Defendants were focused before and during the Relevant Period on ensuring low customer acquisition costs for BetterHelp.

78. For this reason, before and during the Relevant Period, the Individual Defendants repeatedly linked BetterHelp's customer acquisition cost performance, and related ad spend yield, with BetterHelp's revenue and adjusted EBITDA performance.

79. For example, during the July 2022 Conference, defendant Murthy stated that "the dynamics through the year in terms of the ad spend [for BetterHelp] will have now on much more perceptible impact on [Teladoc's] overall margins."

80. Likewise, during the earnings conference call conducted by the Individual Defendants on April 26, 2023 to discuss Teladoc's 1Q23 financial results (the "April 2023 Conference"), defendant Gorevic stated that "[c]ustomer acquisition trends have remained stable year-to-date, resulting in solid margin pull-through[.]"

81. In addition, during the April 2023 Conference, defendant Murthy stated that "the cost of customer acquisitions remaining stable so far this year, that's actually allowed us to effectively deploy a little bit more capital over the course of the quarter of driving higher member acquisitions . . . and driving better revenue."

82. Analysts also linked BetterHelp's customer acquisition cost performance to BetterHelp's financial results. For example, Barclays stated in a February 23, 2023 report on Teladoc that "management expects to drive margin improvement through advertising spend efficiencies/improving marketing spend yield[.]" Further, Truist stated in an April 26, 2023 report on Teladoc that "BetterHelp segment revenue increased 21% Y/Y . . . driven by growth in membership and stable customer acquisition cost."

83. Accordingly, at all relevant times before and during the Relevant Period, analysts and stockholders paid careful attention to BetterHelp's ad spend yield and related customer acquisition cost performance.

**The Individual Defendants Manipulated BetterHelp's Advertising Spend During FY23 to Cause Revenue and Adjusted EBITDA to Perform in a Predictable Season Pattern**

84. As the Individual Defendants repeatedly explained to analysts and stockholders before and during the Relevant Period, Teladoc purposely manipulates the relationship between advertising and marketing expenditure for BetterHelp and BetterHelp's revenue, adjusted EBITDA, and paying users to follow a predictable yearly seasonal pattern.

85. Essentially, Teladoc purposely lowers the advertising and marketing expenditure for BetterHelp in Q4 of each year because ad spending is more costly during the holiday season. Increased ad costs during the holiday season mean that BetterHelp's customer acquisition costs will increase in Q4 if spending does not decrease. Stated differently, if BetterHelp maintained the same level of ad spend in Q4 as in Q3, then the Q4 ad spend dollars would result in the conversion of fewer new paying users compared to the same ad spend in Q3. BetterHelp's purposely lower ad spend in Q4 causes Q4 to have higher adjusted EBITDA because less spending increases profits, and similar revenue and paying user growth to Q3 because of the lag in time between decreasing the ad spending and the realization of new business from the Q3 ad spending. Conversely, in Q1, Teladoc must ramp advertising and marketing expenditure back to Q3 levels, which causes adjusted EBITDA to decrease. Revenue and paying user growth also decreases in Q1 because of decreased ad spending in Q4, given that there is a delay between when less advertising dollars are spent (*i.e.*, Q4) and when those reduced dollars result in bringing in revenue from new paying users (*i.e.*, Q1). Q2 and Q3 see a continuation of the advertising and marketing expenditure from Q1, but revenue, adjusted EBITDA, and paying user performance stabilize as ad spending normalizes from the planned decrease in Q4.

86. The Individual Defendants frequently told stockholders during FY23 that BetterHelp's performance would align with the predictable seasonality described above. For

example, the 2022 Form 10-K, signed by defendants Gorevic, Murthy, Snow, Daniel, Evans, Fenwick, Frist, Jacobson, McKinley, Paulus, Shedlarz, and Smith, states as follows:

> Due to the higher cost of customer acquisition during the end-of-year holiday season, our BetterHelp segment has historically reduced marketing activity during the fourth quarter. As a result of this dynamic, we have typically experienced fewer new member additions and the strongest operating income performance in the fourth quarter. Conversely, as marketing activity typically resumes at the start of the year we typically experience the weakest operating income performance during the first quarter as new customer acquisition and revenue growth lags marketing spend.

87. The same information recited in the prior paragraph was repeated by the Individual Defendants in the 1Q23 Form 10-Q, the 2Q23 Form 10-Q, and Teladoc's Quarterly Report on Form 10-Q for the fiscal quarter ended September 30, 2023 ("3Q23"), which was filed with the SEC on October 27, 2023, and signed by defendants Gorevic and Murthy (the "3Q23 Form 10-Q").

88. Likewise, during the earnings conference call to discuss Teladoc's FY22 financial results held on February 22, 2023 (the "February 2023 Conference"), defendant Murthy reiterated that it was "important" for stockholders to remember BetterHelp's planned seasonal performance, stating that:

> It's important to remind you of the seasonality dynamic in the BetterHelp business. As we have discussed throughout 2022, we typically see slower advertising spend in the fourth quarter during the holiday season. This drives lower customer acquisition in the back half of the fourth quarter and results in the strongest seasonal margin quarter of the year for BetterHelp. It also results in the seasonally weakest sequential growth and margins of the year in the first quarter as advertising spend is ramped up and the customer acquisition funnel rebuild[s]. As such, our guidance assumes the first quarter to be the low point of the year for BetterHelp margins, and we expect consistent margin progression over the course of 2023.

89. Shortly thereafter, during an analyst conference on March 6, 2023, defendant Murthy was asked by an analyst "[c]an you dive into why the BetterHelp business sees such a margin ramp throughout the year," and defendant Murthy responded that:

> ***I'm glad you asked the question because, frankly, we've been getting a ton of questions on that since our earnings call***. So it's a good opportunity for us to reinforce the margin progression . . . Let's start with Q4. So typically, in Q4 in this business, we essentially throttle back, pull back in our spend. The reason we do that is for a couple of dynamics going on. One, holiday pricing is more expensive. And two, it's the time of the year where consumers are thinking about the holidays, less about getting therapy service and me[n]tal health services. So conversion is just a little bit more inefficient at that time. Also, what happens since Q4 is you get the pullback in an ad spend and so you have the help on cost, but the revenue impact of that lag. So that is the combination of the 2 is what gets us to stronger margins very typically in Q4. Pulling back on ad spend, though means as we exit the year, there's fewer member acquisitions and that has an impact on revenue in 1Q, which is why you will find 1Q to be sequentially weaker typically in revenue growth. And also in 1Q, we are ramping up ad spend as we sort of build a book of business up for (inaudible). So you take the holiday from that. And so 1Q typically ends up being weaker and larger than revenue growth. So that's a little bit of what happens in a normal year in BetterHelp from a seasonality standpoint.

90. The Individual Defendants again addressed the planned seasonality in BetterHelp's performance during the April 2023 Conference, with the Individual Defendants variously stating as follows:

> Murthy: As discussed over the last several quarters, the first quarter is typically the seasonally weakest quarter as marketing expense ramps up following the fourth quarter holiday season. As such, we continue to expect the first quarter to be the low point of the year for BetterHelp segment margins. And as Jason [Gorevic] mentioned, we expect consistent quarter-over-quarter margin improvement progression throughout the course of 2023.
>
> ***
>
> Gorevic: [W]e would expect to see a lower ad spend in the fourth quarter, reflecting the more expensive advertising market at that time of year.
>
> ***
>
> Murthy: We -- you saw in 4Q[22], we pulled back on ad spend quite significantly because that is typically the less efficient time for us to essentially spend. Consumers are distracted by other things and ad pricing is typically more expensive. What we had also said when we gave guidance, if you recall, is that we are ramping our ad spend in 1Q[23], and we also, therefore, expected 1Q[23] to be seasonally the lowest point from a margin perspective in the year for BetterHelp because of that. So as we have ramped up ad spend through the quarter, what you are seeing is essentially consumers, members coming on to the platform through

> the quarter, including right until the end of the quarter. And so if you think about the revenue capture from them, that will continue as we go through Q2[23] and the rest of the year, which is why I made the comment a few minutes ago that the exit point for 1Q[23] and the member acquisitions that we have had in the quarter that has performed above our expectations gives us incremental confidence about revenue as we go through Q2[23], et cetera.

91. Analysts also frequently commented on the planned seasonality for BetterHelp's performance before the Relevant Period. For example, Credit Suisse stated in a February 22, 2023 report on Teladoc that "[t]he guidance assumes the first quarter to be the low point of the year for BetterHelp margins, with constituent margin progression over the course of 2023."

92. Analysts made similar statements at the start of the Relevant Period. For example, Truist stated in an April 26, 2023 report on Teladoc that "[t]he company highlighted that the first quarter is typically seasonally the weakest quarter as marketing expense ramps up following the fourth quarter holiday season. The company continues to expect Q1 to be the low point of the year for BetterHelp segment margins and expects consistent quarter-over- quarter margin improvement progression throughout the course of 2023." In addition, Barclays stated in an April 27, 2023 report on Teladoc that "TDOC continues to expect BetterHelp ad spend to ramp down materially in 4Q23 creating a similar EBITDA margin ramp trend that was projected and occurred in 2022 . . . TDOC continues to expect sequential BetterHelp margin improvement over the four quarters[.]"

93. Indeed, BTIG stated in a July 24, 2023 report on Teladoc that "[t]he year is 4Q:23 weighted, and depends on BetterHelp. While this quarter's results will be important, full year EBITDA guidance is weighted heavily to 4Q:23 results."

94. Accordingly, by the start of the Relevant Period, the Individual Defendants told analysts and stockholders to expect similar adjusted EBITDA in 3Q23 as in 2Q23, a deceleration in advertising and marketing expenditure in 4Q23 accompanied by significant adjusted EBITDA gains, and for BetterHelp to perform in FY24 according to the expected seasonal pattern the

Individual Defendants repeatedly articulated. Moreover, the Individual Defendants' intentional seasonal pattern for BetterHelp demonstrated that the Individual Defendants were closely monitoring the efficiency of BetterHelp's ad spend yield, and related customer acquisition costs, by the start of the Relevant Period.

**BetterHelp's Customer Acquisition Costs Temporarily Increased in the Social Media Channel During FY22**

95. Although Teladoc has a planned seasonality for BetterHelp's performance during each fiscal year, increased CAC (meaning lower yields on ad spending) could disrupt the Company's plan.

96. That dynamic occurred during FY22 when temporary increased customer acquisition costs were caused by unusually increased competitor ad spending in the social media and paid advertising channels. In response, Teladoc was forced to decrease BetterHelp's ad spending in 1Q22 and 2Q22, which had a corresponding negative impact on adjusted EBITDA during those two fiscal quarters.

97. According to defendant Gorevic when presenting Teladoc's 1Q22 financial results on April 27, 2022 (the "April 2022 Conference"):

> ***[I]n March [2022] . . . we began to see increases in cost per acquisition and a corresponding decline in revenue yield on our advertising dollar.*** There were 2 primary channels that drove that: number one is paid search, and ***number two is paid social media***. I would say that we strongly attribute that to smaller private competitors who have been recently well funded with a rash of venture capital money flowing into that space and making what we would consider to be economically irrational decision[s].

98. Defendant Gorevic's statements during the April 2022 Conference confirm that the Individual Defendants had the ability during the Relevant Period to quickly discern: (1) when customer acquisition costs increased in the social media channel; and (2) the source of increased customer acquisition costs in the social media channel.

99. Defendant Murthy further explained during the April 2022 Conference that increased customer acquisition cost "is driving the reduced margin" expected for BetterHelp in 2Q22, demonstrating the importance that the Individual Defendants placed on constantly monitoring CAC in the social media channel.

100. The Individual Defendants continued to closely monitor customer acquisition costs for BetterHelp as 2Q22 progressed. During the July 2022 Conference, defendant Gorevic explained that increased CAC had continued to negatively impact BetterHelp's performance, stating that: "BetterHelp performance did come in towards the lower end of our expectations as we continued to experience the decline in yield on marketing spend that we discussed in April. We still see smaller private competitors pursuing what we believe are low or no return customer acquisition strategies to establish market share."

101. Defendant Gorevic's statements during the July 2022 Conference confirm that the Individual Defendants were constantly monitoring BetterHelp's ad spend yield in the social media channel during the Relevant Period.

102. By 3Q22, the temporary impact to customer acquisition costs caused by increased competitor advertising had stabilized, causing the Individual Defendants to declare that BetterHelp would resume the planned seasonality of decreased ad spending, and increased adjusted EBITDA, in 4Q22.

103. During the October 26, 2022 conference with analysts and stockholders to present Teladoc's 3Q22 financial results (the "October 2022 Conference"), defendant Gorevic stated that "[w]hile yield on advertising spend remains below where we expected it to be at the beginning of the year, we've seen it stabilize as anticipated." Defendant Murthy confirmed during the October 2022 Conference that "[w]e continue to expect the typical seasonal slowdown in advertising

spending during the holiday season in the direct-to-consumer market, and therefore, expect to see material acceleration in consolidated adjusted EBITDA margin in the fourth quarter."

104. The predicted stabilization in customer acquisition costs for BetterHelp was favorably received by analysts. For example, JP Morgan stated in an October 27, 2022 report on Teladoc that "[s]tabilization in customer acquisition costs is a welcome relief. A relevant topic for BetterHelp in recent quarters has been customer acquisition costs."

105. Accordingly, the increased customer acquisition costs experienced by BetterHelp during FY22: (1) confirmed that the Individual Defendants were capable of quickly discerning the existence and source of increased customer acquisitions costs for BetterHelp in the social media channel during the Relevant Period; and (2) caused analysts and stockholders to be highly focused on BetterHelp's ad spend yield and customer acquisition costs during the Relevant Period.

**In July 2023, the FTC Forced Teladoc to Stop Allegedly Stealing BetterHelp Customers' Confidential Health Information to Improve Social Media Advertising Effectiveness**

106. Since being acquired by Teladoc in 2015, BetterHelp was not content to passively make advertising and marketing expenditure in the social media channel. Instead, BetterHelp engaged in an alleged fraudulent scheme to use false pretenses to steal confidential health information from their customers – individuals suffering from mental health disorders – in order to boost the effectiveness of BetterHelp's social media advertising efforts. The FTC investigated BetterHelp's allegedly illegal practice, and Teladoc paid a first-of-its-kind $7.8 million settlement to compensate BetterHelp customers for allegedly compromising their private health data.

107. According to the complaint filed by the FTC on March 2, 2023 (the "FTC Complaint"), in signing up for BetterHelp's service, customers were asked to fill out a survey to determine which counselor to assign them to, which required customers to provide "certain

information about their health status and histories – such as the fact that they are seeking or are in therapy, and whether they have previously been in therapy."

108. According to the FTC Complaint, by signing up with BetterHelp, customers also provided their email addresses and IP addresses, which allowed BetterHelp to link specific customers as being more inclined to seek or receive mental health treatment.

109. Recognizing the sensitivity of the information BetterHelp was receiving, the FTC Complaint explains that BetterHelp's website told customers that the private health information they provided would not be shared with anyone other than their counselor, and falsely implied that BetterHelp was complying with the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), as follows:


Are you currently taking any medication?
No
Yes
Rest assured - your health information will stay private between you and your counselor.


Notes about the privacy of your email
Your email address is kept strictly private. It is never shared, sold or disclosed to anyone. Even your counselor won't know your real email address.
The content of all the messages between you and your counselor will appear only in our secure private system. We will only send you emails with alerts about new messages that are waiting for you.
Your email address is used to log in to our private secure server. Make sure you type it correctly.

> **D. Respondent's Deceptive HIPAA Seal**
>
> 65. From September 2013 to December 2020, Respondent displayed seals—in proximity to seals provided by third parties to Respondent—implying Respondent's purported compliance with HIPAA. These seals are circled in red below:
>
> September 2013 – December 2015:




> January 2016 – December 2020:




110. According to the FTC Complaint, from 2013 to at least December 2020, BetterHelp was not protecting the confidential health information provided by its customers when seeking mental health treatment, nor was BetterHelp ever HIPAA compliant.

111. Instead, according to the FTC Complaint, BetterHelp gave its customers' private health information to social media companies to improve BetterHelp's ad spend yield in the social media channel by allowing for more targeted advertisements.

112. Specifically, according to the FTC Complaint, in advertising on Facebook, Snapchat, Criteo and Pinterest during this time period, BetterHelp gave these social media companies its customers' "email addresses, IP addresses, enrollment in [BetterHelp], and certain [questionnaire] responses[.]"

113. According to the FTC Complaint, each disclosure violated BetterHelp's obligation to protect its customers' personal health information "because it both identified the individual (via

the IP address) and conveyed to the recipient third party that the [customer] was seeking and/or receiving mental health treatment via [BetterHelp]."

114. The FTC Complaint confirmed that BetterHelp disclosed personal information to Facebook for "***nearly 2 million in total***" customers – constituting "***all their current and former [customers]***," in order to allow Facebook to "target[] them all with advertisements to refer their Facebook friends to [BetterHelp]."

115. The FTC Complaint confirmed that BetterHelp disclosed personal information to Facebook for "***nearly 2 million in total***" customers – constituting "***all their current and former [customers]***," in order to allow Facebook to "target[] them all with advertisements to refer their Facebook friends to [BetterHelp]."

116. According to the FTC Complaint, BetterHelp purportedly stopped these allegedly illegal practices only after reporters "brought these practices to light and the FTC began investigating the practices[.]"

117. Essentially, the FTC Complaint alleges that BetterHelp was taking confidential, private health information that it falsely promised to keep private in order to improve the effectiveness of, and thereby the yield on, the advertising and marketing expenditure made by BetterHelp in the social media channel.

118. On July 14, 2023, the FTC finalized an order requiring BetterHelp to pay $7.8 million to consumers (the "FTC Final Order"). According to the FTC, BetterHelp's alleged misconduct was so egregious that "***[t]his is the first [FTC] action returning funds to consumers whose health data was comprised***."

119. In addition to the monetary penalty, the FTC Order required BetterHelp to take numerous steps to protect customers' private health information from advertising companies by,

among other things: (1) "ban[ning] BetterHelp from sharing consumers' personal information for re-targeting"; (2) requiring BetterHelp to "obtain affirmative express consent before disclosing personal information to certain third parties for any purpose"; and (3) requiring BetterHelp to "direct third parties to delete the consumer health and other personal data that BetterHelp shared with them[.]"

120. The FTC Order also mandates that once per year for ten years "a senior corporate manager" of BetterHelp must certify to the FTC that BetterHelp is complying with the FTC Order and has not observed any noncompliance with the FTC Order.

121. In light of the FTC Complaint and the first-of-its-kind FTC Order, by July 14, 2023 at the latest, the Individual Defendants understood that BetterHelp's advertising in the social media channel had become less effective, and therefore more expensive and less profitable, because they could no longer improve the effectiveness of BetterHelp's social media advertisements by allegedly stealing their customers' private health information. The FTC Complaint and the FTC Order also meant that the Individual Defendants had to increase oversight and monitoring of the social media advertising channel by July 2023.

122. Accordingly, by the start of the Relevant Period, the Individual Defendants necessarily understood by July 2023 that if BetterHelp's social media channel advertising yield decreased because of increased customer acquisition costs, that development would have an outsized negative impact on BetterHelp's revenue, adjusted EBITDA, and paying user growth performance in 3Q23, 4Q23, and FY24, because that would cause social media advertising to be even less effective, and even more expensive, following the FTC Order.

**The Individual Defendants Knew, or Recklessly Disregarded, That the Yield on BetterHelp's Social Media Advertising Materially Decreased Starting in 3Q23, Meaning Increased CAC – Not Planned Seasonality – Was Driving BetterHelp's 3Q23 and 4Q23 Underperformance**

123. The Individual Defendants admitted during the February 2024 Conference (defined below) that they understood that increased CAC caused by BetterHelp's saturation of the social media channel had been negatively impacting BetterHelp's revenue, adjusted EBITDA, and paying user performance by July 1, 2023. Thus, at the start of the Relevant Period, the Individual Defendants knew, or recklessly disregarded, that increased CAC, and not only the planned seasonality for BetterHelp's performance, was driving BetterHelp's revenue, adjusted EBITDA, and paying user metrics performance in 3Q23, 4Q23, and FY24.

124. For the reasons discussed above, the Individual Defendants were closely monitoring BetterHelp's ad spend yield in the social media channel by the start of the Relevant Period. Indeed, during a November 30, 2022 analyst conference (the "November 2022 Conference"), defendant Murthy acknowledged that "[w]e look at this hourly and daily," with "this" meaning BetterHelp's ad spend yield across various channels, including the "social media" channel and, specifically, "Facebook."

125. Defendant Murthy's admission during the November 2022 Conference establishes that the Individual Defendants were constantly monitoring BetterHelp's ad spend yield in the social media channel. This means that the Individual Defendants knew by July 25, 2023, that BetterHelp's ad spend yield in the social media channel had materially deteriorated starting by July 1, 2023. Thus, the Individual Defendants necessarily also understood by the start of the Relevant Period that increased customer acquisition costs, and not only the predictable planned cadence for BetterHelp's ad spending in 3Q23 and 4Q23, was driving the performance BetterHelp's revenue, adjusted EBITDA and paying user metrics during the Relevant Period.

126. Nonetheless, before and during the Relevant Period, the Individual Defendants told stockholders the opposite, *i.e.*, that BetterHelp would exhibit the expected seasonal

performance pattern in FY23. For example, during the February 2023 Conference, the Individual Defendants told analysts and stockholders that FY23 would mark a return to the predictable seasonal pattern for BetterHelp's advertising and marketing expenditure and related revenue, adjusted EBITDA, and paying user growth performance.

127. In addition, because of BetterHelp's experience with a temporary increase in customer acquisition costs in FY22, and BetterHelp maturing into a $1 billion in revenue per year business by FY22, during the February 2023 Conference the Individual Defendants stated that they would prioritize adjusted EBITDA improvement over revenue growth for BetterHelp in FY23. Specifically, defendant Murthy stated that "we are making a choice this year to grow [BetterHelp] a little bit slower ***and drive margin improvement***."

128. By focusing analysts and stockholders on BetterHelp's adjusted EBITDA performance in FY23, the Individual Defendants further enhanced the materiality of BetterHelp's ad spend yield and customer acquisition costs to stockholders during the Relevant Period because less effective ad spending directly reduces BetterHelp's adjusted EBITDA.

129. During the April 2023 Conference, the Individual Defendants reported that BetterHelp had followed the expected seasonal pattern in 1Q23, with "stable" customer acquisition costs "year-to-date," which allowed for slightly better adjusted EBITDA performance in 1Q23, "what is typically our seasonally weakest quarter."

130. Nonetheless, defendant Murthy stated during the April 2023 Conference that BetterHelp would still adhere to the expected seasonal pattern, stating that "we continue to expect [1Q23] to be the low point of the year for BetterHelp segment margins . . . we expect consistent quarter-over-quarter margin improvement progression throughout the course of [FY23]."

131. On July 26, 2023, the day after the Individual Defendants held an earnings conference call post-market close on July 25, 2023, they presented Teladoc's financial results for 2Q23 (the "July 2023 Conference").

132. During the July 2023 Conference, defendant Gorevic assured stockholders that BetterHelp's customer acquisition costs remained stable, stating that "we've also seen stable customer acquisition costs through the first half of the year." In addition, defendant Murthy reiterated to stockholders that BetterHelp would follow the expected seasonal pattern, stating that "the cadence of ad spending is more balanced across the first 3 quarters of the year . . . [and] the sequential revenue contribution is also going to be more balanced across the quarters[.]"

133. Defendant Murthy made this statement in response to an analyst question that presumed a then-present "stability in [CACs]," thereby indicating that the Individual Defendants' earlier statements during the July 2023 Conference had given analysts and stockholders the materially false and misleading impression that no change in BetterHelp's customer acquisition costs had occurred by July 25, 2023.

134. Indeed, analysts interpreted the Individual Defendants' statements during the July 2023 Conference to mean that BetterHelp would follow the expected seasonal pattern and that customer acquisition costs for BetterHelp were currently stable as of the July 2023 Conference. For example, BTIG stated in a July 25, 2023 report on Teladoc that "***[i]t sounds like CACs are under control***[.]" BTIG further noted in the same report that "management highlighted that ad-spend for BetterHelp will be more consistent from 1Q:23-3Q:23 this year[.]" Likewise, William Blair stated in an July 25, 2023 report on Teladoc that "***[m]anagement also noted that the yield on DTC marketing spend for BetterHelp remains stable*** . . . a clear reversal of the headwinds the division experienced throughout most of [FY22]." In addition, over two months ***after*** the July

2023 Conference, Cowen stated in an October 5, 2023 report on Teladoc that "we believe TDOC should be able to grow BetterHelp Paying Users in 2023 and beyond, ***particularly as CAC dynamics continue to alleviate***."

135. Thus, the Individual Defendants' statements during the July 2023 Conference misled analysts and stockholders into falsely believing that BetterHelp's customer acquisition costs had not experienced any material deterioration in the July 2023 to October 2023 time frame when, in fact, they had.

136. On October 24, 2023, the Individual Defendants held an earnings conference call post-market close to present Teladoc's financial results for 3Q23 (the "October 2023 Conference"). During the October 2023 Conference, defendant Murthy admitted that BetterHelp's ad spending yield had experienced "a modest deterioration" in 3Q23 and that this trend was "likely to persist in this range through" 4Q23, but did not specify the social media channel as being impacted, or acknowledge that BetterHelp had reached a point of diminishing returns on ad spend in that channel.

137. The Individual Defendants also reported during the October 2023 Conference that paying users had declined to an average of 459,000, representing BetterHelp's first decline in paying users in FY22 and FY23. Thus, BetterHelp's paying user metric did not follow the planned seasonal performance for BetterHelp in 3Q23.

138. Analysts were surprised by BetterHelp's decline in paying users in 3Q23. For example, Guggenheim stated in an October 24, 2023 report on Teladoc that "[t]he q/q decline in paying users was surprising to us given the company spent $7M more on ads & marketing in 3Q than in 2Q, and the ad spend in the quarter was near the high historical watermark as a % of sales."

139. Likewise, the Individual Defendants reported during the October 2023 Conference that BetterHelp's adjusted EBITDA for 3Q23 was only $26 million, an approximate 24% ***decrease*** from BetterHelp's adjusted EBITDA in 2Q23 of $34.2 million. Thus, BetterHelp's adjusted EBITDA metric also did not follow the planned seasonal performance for BetterHelp in 3Q23.

140. The Individual Defendants' admission that BetterHelp had experienced "a modest deterioration" in ad spend yield during 3Q23 means that the Individual Defendants knew by no later than October 24, 2023, that increased customer acquisition costs, and not only the planned cadence for BetterHelp's ad spending in 4Q23, was driving BetterHelp's revenue, adjusted EBITDA and paying user underperformance in 4Q23 and FY24.

141. Indeed, as demonstrated by defendant Murthy's admission during the November 2022 Conference that the Individual Defendants were monitoring BetterHelp's ad spend yield in the social media channel on a daily and hourly basis, by disclosing "a modest deterioration" in BetterHelp ad spending yield as of October 24, 2023, this meant that the Individual Defendants were actively tracking – and therefore knew about – the true extent of the increase in BetterHelp's customer acquisition costs in the social media channel as of the October 2023 Conference.

142. In response to this partial corrective disclosure made after the market closed on October 24, 2023, the price of Teladoc common stock declined approximately $0.71 per share, or nearly 4%, from a close of $18.12 per share before the announcement on October 24, 2023 to close at $17.41 per share on October 25, 2023.

143. Nonetheless, the Individual Defendants continued to mislead stockholders during the October 2023 Conference about the full extent of the deterioration in BetterHelp's ad spend yield. For example, during the October 2023 Conference, defendant Murthy falsely told

stockholders that BetterHelp was experiencing a "more stable advertising environment compared to [FY22] as well as sustained gross margin improvement."

144. Unbeknownst to stockholders, however, BetterHelp's advertising environment was not "more stable" compared to FY22. Instead, BetterHelp's current advertising environment had significantly deteriorated because BetterHelp had saturated the social media ad channel and could no longer profitably make additional ad spend in that channel, whereas in FY22, BetterHelp's increased customer acquisition costs came from unsustainable temporary spending increases by competitors. Thus, BetterHelp's current advertising environment was not leading to "sustained gross margin improvement," but was instead currently harming gross margins and would continue to do so since the social media ad channel was providing diminishing returns on ad spend, *i.e.*, had become a less profitable source of growth.

145. As a result of the Individual Defendants' false and misleading statements made during the October 2023 Conference, analysts and stockholders were unable to discern the full scope of the deterioration in BetterHelp's ad spend yield as of 3Q23, or pinpoint it to the social media channel. For example, Truist stated in an October 25, 2023 report on Teladoc that "while not necessarily a deterioration [in the yield on BetterHelp's ad spend], TDOC is not seeing the improvement to track towards the high end of its initial BetterHelp revenue guidance range." Likewise, Evercore stated in an October 24, 2023 report on Teladoc that "management noted that the yield on the ad dollar still remains slightly below the midpoint of expectations."

146. Defendant Gorevic spoke to stockholders again on November 28, 2023 at an analyst conference (the "November 2023 Conference") about BetterHelp's performance. During the November 2023 Conference, defendant Gorevic falsely stated that BetterHelp was performing according to the planned seasonal pattern, stating that "we always pull back on ad spend at this

time of the year [in 4Q23]." In addition, during the November 2023 Conference, defendant Gorevic again falsely downplayed BetterHelp's ad spend yield decline in 3Q23, stating that "[i]t's just stayed a little worse than our expectations for the year . . . They're slightly worse than our expectations."

147. In response to defendant Gorevic's comments at the November 2023 Conference, Piper Sandler stated in a November 28, 2023 report on Teladoc that "[d]ue to the cadence of ad spend in 2023, we think 4Q23 BetterHelp revenue guidance understates the true growth rate of this business . . . ***We model BetterHelp CACs approximately flat in 2023, 2024, and 2025[.]***" By Piper Sandler modeling flat customer acquisition costs for 2023, 2024, and 2025, this demonstrates that the Individual Defendants had falsely convinced analysts that there had only been "a modest deterioration" in BetterHelp's customer acquisition costs and ad spending yield as of November 28, 2023.

148. Indeed, defendant Gorevic continued misleading stockholders after 4Q23 ended during a January 9, 2024 analyst conference (the "January 2024 Conference"). Defendant Gorevic falsely stated during the January 2024 Conference that "I've had investors ask me, 'Hey, is [BetterHelp] run out of growing room? Is it going to shrink next year?' I don't think there's any scenario where we believe that that's the case."

149. Unbeknownst to stockholders, however, and as the Individual Defendants belatedly admitted on February 20, 2024 when presenting Teladoc's financial results for 4Q23 and FY23 (the "February 2024 Conference"), because the ad spend yield in BetterHelp's social media channel had materially declined (and customer acquisition costs had materially increased), due to BetterHelp saturating the social media advertising channel, BetterHelp would materially shrink in FY24.

150. Thus, the Individual Defendants knew, or recklessly disregarded, by July 25, 2023, that the deteriorating yield on advertising spend in the social media channel meant that BetterHelp would no longer follow the expected seasonal pattern. Instead, BetterHelp had saturated the social media advertising channel and BetterHelp was compressing its adjusted EBITDA by making additional advertising and marketing expenditure in this channel.

151. Defendant Gorevic admitted this during the February 2024 Conference, stating that "revenue and margins were below our expectations in [4Q23] as we saw lower yields on marketing spend. Specifically, ***we experienced returns on our social media advertising spend that were below target in the second half of the year***, which was a departure relative to the first half." In other words, defendant Gorevic confirmed during the February 2024 Conference that BetterHelp's decreased ad spend yield in the social media channel had begun by July 1, 2023.

152. Defendant Gorevic further admitted during the February 2024 Conference that decreased advertising yield in the social media channel for BetterHelp was so significant that it would persist into FY24, "and as a result, will [negatively] impact [BetterHelp's] year-over-year growth rates in the first half of 2024."

153. Defendant Murthy was asked during the February 2024 Conference by an analyst to pinpoint "***when you all first observe the declining ad yield in BetterHelp***," and defendant Murthy responded that "***[w]e had actually started observing the yields coming in lower than we had expected in the back half of the year***." In other words, defendant Murthy admitted that BetterHelp's decreased advertising yield in the social media channel had begun by July 1, 2023.

154. Defendant Gorevic was asked during the February 2024 Conference by an analyst to "provide a little more detail on why those marketing yields remain depressed." In response,

defendant Gorevic confirmed that BetterHelp had saturated the advertising market in the social media channel, stating that:

> ***[W]e don't see a significant competitor driving up the rates***. We do see a lot of advertisers in general going after a similar population. So I wouldn't say that it's a single competitor as opposed to the overall traffic in the ad space, so to speak. And then maybe the last thing I'll say is that we do see it certainly more as we spend more, right? ***So as we increase our ad spend, we're constantly looking at the marginal return on the -- on each incremental dollar. And so we work hard to make sure that each incremental dollar is productive for us. And to the degree that we see the curve get to an inflection where we run out of room on where we can spend that money productively then we pull back rather than chasing growth at the expense of profitability.***

155. Unsurprisingly, in conjunction with the February 2024 Conference, the Individual Defendants caused the Company to issue a press release and Current Report on SEC Form 8-K that provided FY24 adjusted EBITDA guidance for BetterHelp of "[f]lat +/- 50bps" versus FY23, indicating to stockholders that increased customer acquisition costs in the social media channel prevented BetterHelp from growing profit in FY24.

156. During the February 2024 Conference, the Individual Defendants further disclosed that BetterHelp's paying users had again declined, down to an average of 425,000 paying users for 4Q23. Thus, BetterHelp's paying user metric did not follow the planned seasonal performance for BetterHelp in 4Q23.

157. Even with the temporary customer acquisition cost increases in FY22, BetterHelp's paying user growth never declined quarter-over-quarter in FY22, and instead increased during each fiscal quarter in FY22. Thus, the declines in BetterHelp's paying users in 3Q23 and 4Q23 further demonstrate that BetterHelp's customer acquisition costs had materially and substantially increased by July 1, 2023, that this change was significantly worse than the FY22 temporary increases in customer acquisition costs, and that the Individual Defendants necessarily understood these realities by the start of the Relevant Period.

158. During the February 2024 Conference, the Individual Defendants also disclosed that the main profit driver for Teladoc in FY23 was Integrated Care, not BetterHelp, contrary to what analysts and stockholders had expected based on the Individual Defendants' representations. Specifically, Integrated Care's adjusted EBITDA grew by 42% in FY23, compared to an increase of only 19% for BetterHelp. In other words, BetterHelp's profit metric significantly underperformed in 3Q23 and 4Q23.

159. In response to the corrective disclosures made after the market closed on February 20, 2024, the price of Teladoc common stock declined approximately $4.85 per share, or nearly ***24%***, from a close of $20.49 per share before the announcement on February 20, 2024 to close at $15.64 per share on February 21, 2024.

160. Analysts were stunned by the Individual Defendants' disclosures made during the February 2024 Conference. For example, RBC Capital Markets stated in a February 20, 2024 report on Teladoc that "Sustained Higher Customer Acquisition Costs Weigh on BetterHelp . . . Per TDOC, this was due to continued elevation of CACs, particularly in social media channels[.]". Likewise, TD Cowen stated in a February 20, 2024 report on Teladoc that "***we were cautiously optimistic on the 2024 outlook given mgmt commentary at a conf in early January . . . What we find is a more challenging environment facing TDOC, with BetterHelp growth constrained by persistent elevated CAC*** . . . ***In 2H23, TDOC began to see pressure on BetterHelp customer acquisition costs, particularly in social media channels*** . . . CAC pressure limits the amount of capital TDOC can deploy at an acceptable rate of return[.]"

161. In addition, Truist stated in a February 20, 2024 report on Teladoc that "***TDOC flagged returns from social media channels (primarily Facebook . . . ) were below target in 2H23 and the company expects those trends to persist in 2024***." Further, Barclays stated in a February

21, 2024 report on Teladoc that "***TDOC shares were down 18% after the call . . . which we note was largely attributable to declining yields in BetterHelp ad spend channels***."

162. Evercore stated in a February 21, 2024 report on Teladoc that "[d]espite improvement earlier in FY23, customer acquisition cost trends have deteriorated and remain challenging." JP Morgan stated in a February 20, 2024 report on Teladoc that "[t]he company did note that it isn't seeing competitors impacting acquisition costs, rather that traffic in the ad space is competitive in the demographics that TDOC is targeting with BetterHelp." And Needham stated in a February 21, 2024 report on Teladoc that "TDOC is seeing pressure on CACs in the social media channel in particular, and while the company employs an omnichannel approach, management does not expect a shift away from social media towards other channels to have a material impact until 2H24."

163. Shortly following the February 2024 Conference, on April 5, 2024, defendant Gorevic was fired from his position as the Company's CEO. In response, defendant Gorevic resigned from the Board that same day.

164. Analysts linked defendant Gorevic's termination to BetterHelp's materially increased customer acquisition costs. For example, UBS stated in an April 8, 2024 report on Teladoc that "[w]e think that investors are most interested to see how a new CEO will decide to position its BetterHelp business given its lackluster long-term growth target guidance (LSD), and how to drive meaningful EBITDA margin expansion from here."

165. As the Individual Defendants admitted during the February 2024 Conference, increased customer acquisition costs and decreased ad spend yield had wreaked havoc on BetterHelp's FY24 performance to-date. During the first fiscal quarter of 2024 ("1Q24"), BetterHelp reported decreased revenue, decreased adjusted EBITDA, and decreased paying users.

During the second fiscal quarter of 2024 ("2Q24"), BetterHelp reported decreased revenue, decreased adjusted EBITDA, and decreased paying users. During the third fiscal quarter of 2024 ("3Q24"), BetterHelp reported decreased revenue, decreased adjusted EBITDA, and decreased paying users.

166. As of 3Q24, BetterHelp only had 398,000 paying users. In other words, the increased customer acquisition costs in the social media channel that the Individual Defendants failed to disclose to analysts and stockholders during the Relevant Period caused BetterHelp to no longer perform according to the predictable seasonal pattern in FY24.

**THE INDIVIDUAL DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING THE RELEVANT PERIOD**

167. During the Relevant Period, the Individual Defendants made a series of materially false and misleading statements, and otherwise violated an obligation to disclose material information, concerning BetterHelp's customer acquisition costs and expected seasonal performance. As noted below in each specific such instance, Judge Karas has sustained federal securities fraud claims in the Securities Action based on certain of these statements.

168. On April 11, 2023, a little more than a month following the March 2, 2023 FTC Complaint, Teladoc filed a Schedule 14A with the SEC (the "2023 Proxy Statement"), which was solicited by defendants Daniel, Fenwick, Fritz, Gorevic, Jacobson, McKinley, Murthy, Paulus, Shedlarz, and Smith.

169. The 2023 Proxy Statement asked Teladoc stockholders to vote to, among other things, (1) reelect defendants Daniel, Fenwick, Gorevic, Jacobson, McKinley, Paulus, Shedlarz, Smith, and Snow to the Board for a one year term ending as of the Company's annual meeting of stockholders in FY 2024; (2) approve, in a non-binding advisory vote, commonly referred to as "say on pay," the compensation of the Company's named executive officers, including defendants

Gorevic and Murthy; (3) approve the Company's 2023 Incentive Award Plan (the "2023 Incentive Award Plan"); and (4) approve an amendment to the Teladoc, Inc. 2015 Employee Stock Purchase Plan.

170. The 2023 Proxy Statement sought shareholder approval for the 2023 Incentive Award Plan, which proposed the issuance of 8.25 million shares. The 2023 Proxy Statement contained material misrepresentations and omissions that significantly influenced shareholders' voting decisions regarding the plan—had shareholders been fully informed about the Company's actual financial condition and the alleged wrongdoing, they likely would not have approved the 2023 Incentive Award Plan. The 2023 Proxy Statement described the plan's purpose as being "to enhance the Company's ability to attract, retain and motivate persons who make (or are expected to make) important contributions to the Company by providing these individuals with equity ownership opportunities." This description, however, was presented without full disclosure of relevant information that could have altered shareholders' perspectives on the plan's necessity and appropriateness.

171. The 2023 Incentive Award Plan permitted the distribution of various stock types, including incentive stock options ("ISOs"). The plan's specifics regarding the quantity of shares approved are outlined in the "Number of Shares Authorized" subsection, which is part of the broader "Summary of the 2023 Incentive Award Plan" section. This subsection delineates the boundaries of these allocations as follows:

> The 2023 Incentive Award Plan ***provides for an aggregate of 8,250,000 shares of our common stock, plus the number of shares remaining available for future grant under the Prior Plans as of the effective date of the 2023 Incentive Award Plan*** and the number of shares of our common stock issued under any of the Prior Plans as of the effective date that is thereafter forfeited, canceled, expires, terminates, otherwise lapses or is settled in cash, in whole or in part, without the delivery of shares of our common stock to be available for awards under the 2023 Incentive Award Plan. ***No more than 8,250,000 shares of our common stock may***

> ***be issued with respect to incentive stock options under the 2023 Incentive Award Plan.***
>
> ***No non-employee director may be granted awards having an aggregate maximum value at the date of grant, together with any cash fees payable to such non-employee director, in excess of $650,000***, except in extraordinary circumstances as determined by the Compensation Committee. Shares of our common stock subject to awards are generally unavailable for future grant unless such awards are subsequently terminated, canceled or forfeited without the participant having benefited therefrom; provided that, in no event shall shares used in payment of the exercise price or strike price of an award or any taxes required to be withheld in respect of an award, shares subject to [stock appreciation rights ("SARs")] that are not issued in connection with the stock settlement of the SAR on exercise thereof and shares purchased by the Company on the open market with the cash proceeds from the exercise of options increase the number of shares of our common stock that may be granted under the 2023 Incentive Award Plan. If there is any change in our corporate capitalization (as discussed below), the Compensation Committee, in its sole discretion, may make substitutions or adjustments to (i) the number of shares reserved for issuance under the 2023 Incentive Award Plan, (ii) the number of shares covered by awards then outstanding under the 2023 Incentive Award Plan, (iii) the limitations on awards under the 2023 Incentive Award Plan, (iv) the exercise price or strike price of outstanding options or SARs, respectively, and (v) such other equitable substitution or adjustments as it may determine appropriate.

172. The 2023 Incentive Award Plan stipulates that non-employee directors are generally limited to a combined total of $650,000 in awards and cash fees. However, the Compensation Committee may approve higher amounts in exceptional circumstances. Board members Daniel, Fenwick, Frist, Gorevic, Jacobson, McKinley, Murthy, Paulus, Shedlarz, Smith, and Snow were all qualified to receive stock awards under this plan. They have already been granted various stock awards and at least some of them are expected to receive significant additional stock awards in the future. As a result, these individuals stand to gain considerable benefits from the implementation of the 2023 Incentive Award Plan.

173. The Company's 2023 Proxy Statement further stated as follows:

> [A]s of March 31, 2023, we had 6,278,157 shares available for grant. The number of shares being requested for authorization under the 2023 Incentive Award Plan is 8,250,000 shares, which we expect to use for future equity grants over approximately the next one year. If the 2023 Incentive Plan is approved by our

> stockholders, we will have, in the aggregate, approximately 14,528,157 shares, which includes the number of shares remaining available for future grant under the Prior Plans as of March 31, 2023, available for issuance to all eligible participants under the 2023 Incentive Award Plan, plus any shares forfeited under Prior Plans following the effective date of the 2023 Incentive Award Plan. If the 2023 Incentive Award Plan is not approved by our stockholders, we will continue to grant equity incentive awards under the Prior Plans until each of the Prior Plans expire or there is no remaining capacity under such plans, and it may become necessary to increase cash compensation to replace any shortfall in available equity, which we do not believe is advisable or in stockholders' best interests. If the 2023 Incentive Award Plan is approved, the Prior Plans will be shut down and no further grants will be made under the Prior Plans.

174. Concerning the Company's Ethics Code, the 2023 Proxy Statement stated the following in pertinent part:

> Our Board has adopted a Code of Business Conduct and Ethics applicable to directors, officers and employees that outlines our corporate values and standards of integrity and behavior and is designed to foster a culture of honesty and accountability, drive compliance with legal and regulatory requirements, protect and promote our reputation, as well as the preparation and maintenance of our financial and accounting information. Our Board has also adopted Corporate Governance Guidelines to assist it in the exercise of its responsibilities.
>
> Our Chief Compliance Officer has responsibility to implement and maintain an effective ethics and compliance program and is responsible to provide updates on that program to the Nominating and Corporate Governance Committee. The Code of Business Conduct and Ethics and the Corporate Governance Guidelines are reviewed annually and periodically amended as the Board enhances our corporate governance practices and programs.
>
> We intend to satisfy the disclosure requirements under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), regarding any amendment to, or waiver from a material provision of our Code of Business Conduct and Ethics involving our principal executive, financial or accounting officer or controller by posting such information on our website. The Corporate Governance Guidelines and Code of Business Conduct and Ethics are available on our website at ir.teladochealth.com by clicking through "Corporate Governance."

175. With respect to the Board's responsibilities in overseeing risk management, the 2023 Proxy Statement stated, in pertinent part:

> The Board believes that evaluating our executive team's management of the risks confronting the Company is one of its most important areas of oversight. The Board

> further believes that taking an active role in the oversight of the Company's corporate strategy and the related risks is appropriate, given our Board members' combined breadth and depth of experience, and is critical to ensuring that the long-term interests of the Company and its stockholders are being served. The Board also encourages management to promote a culture that actively manages risks as a part of the Company's corporate strategy and day-to-day business operations. The Board administers its risk oversight function both directly and through its committees. For risks that fall within a committee's areas of primary responsibility and expertise, the Board assigns oversight to that committee, which then also apprises the full Board of significant matters and management's response. The full Board directly oversees overall corporate risk and strategy and other matters that do not fall within the responsibility of a particular committee.

176. With respect to the duties of the Audit Committee, the 2023 Proxy Statement stated the following:

> The Audit Committee assists the Board in fulfilling its oversight responsibilities with respect to risk management in the areas of:
>
> - Financial reporting
> - Internal controls over financial reporting
> - Cybersecurity
> - Compliance with legal and regulatory requirements
>
> The Audit Committee regularly discusses risk assessment and risk management policies with management and our independent auditors, including our major risk exposures, such as cybersecurity, data privacy, and environmental and social concerns, their potential financial impact on our organization and the steps we take to mitigate and manage these risks, including financial reporting that encompasses disclosure controls and procedures.
>
> The Audit Committee regularly reviews the Company's key risks, risk mitigation strategies, and available related risk mitigation metrics that are identified by our enterprise risk management ("ERM") program. The committee solicits input from directors on the steps taken to mitigate risks and plans for additional mitigation going forward. Our head of internal audit also reports to the Chairman of the Audit Committee.
>
> - The Audit Committee assists the Board with oversight of risk management by:

- reviewing the Company's financial statements and Company's quarterly and annual reports filed with the SEC, including the risk factors disclosed therein

- meeting with our independent auditors at regularly scheduled meetings of the Audit Committee to review their reports on the adequacy and effectiveness of our disclosure and internal controls

- discussing with management our major financial risks and exposures and the steps management has taken to mitigate, monitor and control any risks and exposures.

177. The 2023 Proxy Statement was materially misleading because it failed to disclose that: (i) although Teladoc claimed its officers and directors adhered to the Ethics Code, the Individual Defendants were violating the Code of Conduct; (ii) contrary to the 2023 Proxy Statement's descriptions of the Board's risk oversight responsibilities, the Board and its committees did not adequately exercise these functions and were causing or permitting Teladoc to issue false and misleading statements; and (iii) the Individual Defendants used "pay-for-performance" rewards when calculating executive compensation despite artificially inflating the Company's value by issuing false and misleading statements.

178. The 2023 Proxy Statement was further materially misleading because it failed to disclose to stockholders, *inter alia*, that (i) the Company continued to increase its marketing expenditure throughout 2023, contradicting public statements about reducing advertising spending; (ii) elevated marketing spend, particularly for BetterHelp, led to a deterioration in the Company's revenue, yielding poor returns on investment; (iii) despite acknowledging the potential inefficiency of increased advertising due to market saturation, the Company persisted in escalating its advertising budget for BetterHelp; (iv) contrary to public claims of significant growth potential for BetterHelp membership, the service actually experienced stagnation and subsequent decline in 2023, primarily due to market saturation caused by BetterHelp's own marketing efforts; and (v) as

a result, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis.

179. After the market closed on July 25, 2023, during the July 2023 Conference, defendant Gorevic stated, in pertinent part, that "***[w]e've also seen stable customer acquisition costs through the first half of the year***."

180. This statement was materially false and misleading when made because it created a materially false impression about customer acquisitions costs as of July 25, 2023. Indeed, this statement caused analysts and stockholders to believe that BetterHelp had not experienced any deterioration in customer acquisition costs as of the July 2023 Conference, and failed to disclose that BetterHelp's adjusted EBITDA was being compressed by materially increased customer acquisition costs in the social media channel. Once the Individual Defendants chose to use the July 2023 Conference to speak about BetterHelp's customer acquisition costs, they had a duty to speak completely and truthfully, including about the increase in customer acquisition costs for BetterHelp in the social media channel that began by July 1, 2023.

181. In addition, during the July 2023 Conference defendant Murthy was asked by an analyst to provide more detail about BetterHelp's planned seasonal performance "[g]iven the stability in [CACs.]" Defendant Murthy did not correct the analyst's mistaken belief about BetterHelp's then-current customer acquisition costs, and instead stated, in pertinent part, that:

> So last year, we actually spent more in 3Q than we did in 2Q. And we saw that reflected in the BetterHelp margins last year, which declined over the course of 1Q to 2Q, 2Q to 3Q and then accelerated back up in 4Q. ***So this year, the cadence of ad spending is more balanced across the first 3 quarters of the year in contrast to the steep ramp over the same period last year.*** And so if you think about what the implication of that is, what it means is the sequential revenue contribution is also going to be more balanced across the quarters than last year.

182. The statement that "the cadence of ad spending is more balanced across the first 3 quarters of the year" was materially false and misleading when made because increased customer acquisition costs in the social media channel, and not only the planned seasonal pattern for BetterHelp, was dictating the cadence of BetterHelp's ad spending in 3Q23. By portraying BetterHelp's ad spending cadence as unchanged in 3Q23 and in line with the planned seasonal pattern for BetterHelp, the Individual Defendants created a materially false impression about BetterHelp's then-current customer acquisition costs and ad spend yield.

183. On July 28, 2023, the Individual Defendants caused Teladoc to file the 2Q23 Form 10-Q with the SEC, which stated, in pertinent part, as follows: "[t]here have been ***no material changes to the risk factors previously disclosed*** in [the 2022 Form 10-K]." The 2022 Form 10-K, signed by defendants Gorevic, Murthy, Snow, Daniel, Evans, Fenwick, Frist, Jacobson, McKinley, Paulus, Shedlarz, and Smith, stated in pertinent part that "[w]e spend significant resources marketing [BetterHelp]. Any decrease in the amount or effectiveness of our BetterHelp marketing efforts could lead to lower revenue or growth and profitability of this business."

184. The statement by the Individual Defendants regarding "no material changes to the risk factors previously disclosed" was an inaccurate statement of material fact because BetterHelp's customer acquisition costs in the social media channel had significantly increased as a result of BetterHelp saturating that channel. This meant that the effectiveness of BetterHelp's marketing efforts had, in fact, decreased and was, in fact, negatively impacting BetterHelp's growth and profitability. Thus, instead of accurately describing the present risks to Teladoc posed by the significant increase in customer acquisition costs BetterHelp experienced, the Individual Defendants told stockholders that a previously issued hypothetical risk disclosure had not changed as of the filing of the 2Q23 Form 10-Q, falsely indicating that this risk disclosure remained

hypothetical. As a result, the Individual Defendants' statement misled analysts and stockholders into falsely believing that BetterHelp's risk profile had not materially changed as of the filing of the 2Q23 Form 10-Q when, in fact, it had.

185. Notably, in (partially) sustaining the Securities Action, Judge Karas concluded that the Individual Defendants' challenged public statements on July 28, 2023 were sufficiently alleged to have been materially false and misleading.

186. After the close of trading on October 24, 2023, the Individual Defendants held the October 2023 Conference, during which defendant Gorevic stated, in pertinent part, that "***[c]ustomer acquisition costs remain near the midpoint of our outlook range***[.]"

187. This statement was materially false and misleading when made because it created a materially false impression about CAC as of October 24, 2023. Indeed, this statement caused analysts and stockholders to falsely believe that BetterHelp had not experienced a material increase in CAC in 3Q23, or that the social media channel in particular was the cause of this material increase and had reached the point of diminishing returns, or profits, on ad spend, and failed to disclose that BetterHelp's adjusted EBITDA would be significantly compressed in 4Q23 and FY24 by materially increased CAC in the social media channel.

188. Notably, in (partially) sustaining the Securities Action, Judge Karas concluded that the statement that "***[c]ustomer acquisition costs remain near the midpoint of our outlook range***" on October 24, 2023 was sufficiently alleged to have been materially false and misleading.

189. Also during the October 2023 Conference, defendant Murthy stated, in pertinent part, that BetterHelp was experiencing a "***more stable advertising environment compared to [FY22] as well as sustained gross margin improvement***."

190. This statement was an inaccurate statement of material fact because the BetterHelp advertising environment in 4Q23 was not "more stable" compared to FY22. Instead, BetterHelp's then-current advertising environment had significantly deteriorated compared to FY22 because BetterHelp had saturated the social media ad channel, meaning this channel was providing diminishing returns on ad spend, whereas in FY22 BetterHelp's increased CAC came from temporary ad spending increases from upstart competitors that were not sustainable. In addition, this statement was materially false and misleading because BetterHelp would not achieve "sustained gross margin improvement" because increased CAC meant that BetterHelp's current and future margin would be compressed since it was significantly more costly for BetterHelp to then-currently profitably grow.

191. During the October 2023 Conference, defendant Murthy also stated, in pertinent part, that BetterHelp's "***scale enables us to drive and earn strong returns on our [ad] spend, and that gives us a real advantage***."

192. This statement was an inaccurate statement of material fact because BetterHelp's scale as the largest telehealth advertiser in the social media channel was the reason why BetterHelp's CAC had materially increased in that channel. Thus, BetterHelp's scale was not "earn[ing] strong returns" but instead was the reason why BetterHelp was earning weak returns on social media ad spending, which was significantly compressing BetterHelp's adjusted EBITDA.

193. Notably, in (partially) sustaining the Securities Action, Judge Karas concluded that the statement that "***scale enables us to drive and earn strong returns on our [ad] spend, and that gives us a real advantage***" on October 24, 2023 was sufficiently alleged to have been materially false and misleading.

194. On October 27, 2023, the Individual Defendants caused Teladoc to file the 3Q23 Form 10-Q with the SEC, which stated, in pertinent part, as follows: "[t]here have been ***no material changes to the risk factors previously disclosed*** in [the 2022 Form 10-K]." The 2022 Form 10-K, signed by defendants Gorevic, Murthy, Snow, Daniel, Evans, Fenwick, Frist, Jacobson, McKinley, Paulus, Shedlarz, and Smith, stated, in pertinent part, that "[w]e spend significant resources marketing [BetterHelp]. Any decrease in the amount or effectiveness of our BetterHelp marketing efforts could lead to lower revenue or growth and profitability of this business."

195. This statement by the Individual Defendants on October 27, 2023 regarding "no material changes to the risk factors previously disclosed" was materially false and misleading for the reasons their statements on July 28, 2023 were materially false and misleading.

196. Notably, in (partially) sustaining the Securities Action, Judge Karas concluded that the Individual Defendants' challenged public statements on October 27, 2023 were sufficiently alleged to have been materially false and misleading.

197. On November 28, 2023, defendant Gorevic participated in the November 2023 Conference, during which defendant Gorevic stated, in pertinent part, that "***we always pull back on ad spend [for BetterHelp] at this time of the year [in 4Q23]***."

198. This statement was materially false and misleading when made because increased CAC in the social media channel was causing compression in BetterHelp's adjusted EBITDA performance for 4Q23. By representing that BetterHelp's ad spending was performing in accordance with the planned seasonal pattern, the Individual Defendants created a materially false impression about the sustainability of BetterHelp's adjusted EBITDA performance in 4Q23 and FY24. In reality, because BetterHelp had saturated the social media advertising channel by the

start of 3Q23, BetterHelp no longer had the ability in 4Q23 to grow paying users without sacrificing profit, *i.e.*, adjusted EBITDA growth.

199. Notably, in (partially) sustaining the Securities Action, Judge Karas concluded that the statement that "***we always pull back on ad spend [for BetterHelp] at this time of the year [in 4Q23]***" on November 28, 2023 was sufficiently alleged to have been materially false and misleading.

200. In addition, during the November 2023 Conference, defendant Gorevic stated, in pertinent part, that BetterHelp's current customer acquisition costs were "***a little worse than our expectations for the year . . . They're slightly worse than our expectations***."

201. This statement was materially false and misleading for the same reasons that the October 24, 2023 statement referenced above was materially false and misleading.

202. Notably, in (partially) sustaining the Securities Action, Judge Karas concluded that the representation that BetterHelp's current customer acquisition costs were "***a little worse than our expectations for the year . . . They're slightly worse than our expectations***" on November 28, 2023 was sufficiently alleged to have been materially false and misleading.

203. On January 9, 2024, following the conclusion of FY23, defendant Gorevic participated in the January 2024 Conference, during which defendant Gorevic stated about BetterHelp, in pertinent part, that "***I've had investors ask me, 'Hey, is [BetterHelp] run out of growing room? Is it going to shrink next year?' I don't think there's any scenario where we believe that that's the case***."

204. These statements were materially false and misleading when made because they created a materially false impression that there were no roadblocks to BetterHelp's growth as of January 9, 2024. In reality, BetterHelp's ability to grow in FY24 was nonexistent because of the

significant material increase in customer acquisition costs in the social media channel. Indeed, less than two months after making these statements, the Individual Defendants provided 1Q24 revenue guidance for BetterHelp of negative revenue growth of (6%) to (3%), meaning that the very "scenario" defendant Gorevic claimed was impossible on January 9, 2024, was precisely what the Individual Defendants told stockholders to expect during the February 2024 Conference.

205. Notably, in (partially) sustaining the Securities Action, Judge Karas concluded that the January 9, 2024 statements set forth above were sufficiently alleged to have been materially false and misleading.

**THE PARTIALLY SUSTAINED SECURITIES ACTION**

206. Based on the events discussed herein, in 2024, the Securities Action was initiated in this Court against Teladoc. The operative Securities Complaint was subsequently filed on February 24, 2025, and asserted federal securities fraud claims against Teladoc and defendants Gorevic and Murthy on behalf of a class of investors who purchased Teladoc shares during the Class Period.

207. On March 31, 2026, U.S. District Judge Kenneth M. Karas ("Judge Karas") issued an Opinion and Order denying the defendants' motion to dismiss the Securities Complaint (in material part). Therein, Judge Karas concluded that a number of the defendants' public statements during the Class Period that had been challenged in the Securities Complaint (and specifically noted above in each instance) were sufficiently alleged to have been materially false and misleading. Judge Karas further concluded that there was an inference of scienter. Stated another way, Judge Karas found there was *indicia* that defendants Gorevic and Murthy participated in a scheme to defraud Teladoc investors during the Class Period.

208. As to the inference of scienter, Judge Karas specifically pointed to, among other things, the March 2, 2023 FTC Complaint, which he opined "***would have prompted Defendants to, at the very least, keep social media advertising top of mind and make it likelier that they would have had an interest in BetterHelp's advertising metrics through the Class Period***."

209. Accordingly, the Securities Action against Teladoc is now proceeding towards trial.

**DAMAGES TO TELADOC**

210. As a direct and proximate result of the Individual Defendants' misconduct, Teladoc has lost and expended, and will continue to lose and expend, many millions of dollars.

211. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the sustained Securities Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

212. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

213. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

214. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

215. As a direct and proximate result of the Individual Defendants' conduct, Teladoc has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

**DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS**

216. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

217. Plaintiff is a current stockholder of the Company, has continuously held shares of the Company's stock since November 2020, and was a stockholder of the Company at all times relevant to the Individual Defendants' wrongdoing alleged herein.

218. Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

219. As a result of the facts set forth herein, Plaintiff has not made any demand on the Board to institute this action against the Individual Defendants. Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously pursue this action.

220. The Board currently consists of nine (9) directors: defendants Paulus, Fenwick, Jacobson, Shedlarz, Smith, and Snow, and non-parties Charles Divita III ("Mr. Divita"), Susan Salka, and Michael Smith. A derivative plaintiff need only demonstrate reason to doubt that a majority of the corporation's directors are disinterested or objective in order to establish pre-suit demand excusal. Plaintiff has adequately alleged that there is reason to doubt that at least five (5)

current directors of Teladoc are capable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action, for the following reasons:

221. Demand is excused as to defendants Paulus, Fenwick, Jacobson, Shedlarz, Smith, and Snow, who together comprise a majority of the Board, because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

222. In complete abdication of their fiduciary duties, defendants Paulus, Fenwick, Jacobson, Shedlarz, Smith, and Snow, who together comprise a majority of the Board, either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The scheme alleged herein was intended to make the Company appear more profitable and attractive to stockholders. Moreover, defendants Paulus, Fenwick, Jacobson, Shedlarz, Smith, and Snow, who together comprise a majority of the Board, caused the Company to fail to maintain adequate internal controls. As a result of the foregoing, defendants Paulus, Fenwick, Jacobson, Shedlarz, Smith, and Snow, who together comprise a majority of the Board, breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

223. As Board members of Teladoc charged with overseeing the Company's affairs, defendants Paulus, Fenwick, Jacobson, Shedlarz, Smith, and Snow, who together comprise a majority of the Board, must have had knowledge of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of

Teladoc, defendants Paulus, Fenwick, Jacobson, Shedlarz, Smith, and Snow, who together comprise a majority of the Board, were placed on notice and aware of the March 2, 2023 FTC Complaint, and thus, as discussed by Judge Karas in sustaining the Securities Action, this would have prompted those directors of Teladoc to, at the very least, keep social media advertising top of mind and have an interest in BetterHelp's advertising metrics during the Relevant Period.

224. Defendants Paulus, Fenwick, Jacobson, Shedlarz, Smith, and Snow, a majority of the Board, signed at least some of the materially false and misleading statements made to stockholders giving rise to this derivative action and serving as the basis for the (partially) sustained Securities Action, as alleged herein. Thus, not only did defendants Paulus, Fenwick, Jacobson, Shedlarz, Smith, and Snow permit materially false and misleading statements alleged herein that were made by certain other Individual Defendants -- they also participated in making false and misleading statements to stockholders themselves.

225. It is well-established that a substantial likelihood of liability exists where there is a conscious disregard of a duty to act. Demand is regularly excused under Delaware law where, based on the facts alleged, it is reasonable to infer that directors consciously failed to take such action, in violation of their duties of loyalty and good faith.

226. Under Delaware law, shareholders are entitled to honest communication from directors, given with complete candor and in good faith. Communications that depart from this expectation, particularly where it can be shown that the directors involved issued their communication with knowledge that it was deceptive or incomplete, violate the fiduciary duties that protect shareholders. Such violations are sufficient to subject directors to a derivative claim. Directors who issue false and misleading statements to shareholders are considered to be interested for purposes of pre-suit demand.

227. Conscious disregard for the truth or falsity of statements issued on behalf of the corporation is a breach of the non-exculpable duties of loyalty and good faith. When public representations are made to shareholders, directors are duty-bound to ensure that those statements are complete and truthful. A fiduciary may be held liable for making a material misdisclosure, or if he or she authorizes without fault or knowledge a misleading disclosure, later comes into knowledge of the misleading nature of the previous communication, and knowingly and in bad faith -- in other words, dishonestly -- fails to correct the misleading impression created by the earlier communication.

228. Based on the facts alleged herein, the only reasonable inference is that defendants Paulus, Fenwick, Jacobson, Shedlarz, Smith, and Snow, a majority of the Board, knew and approved of or consciously disregarded the issuance of at least some of the false and misleading statements described herein, and in certain instances, made or joined in making materially incomplete, misleading, and deceptive statements to stockholders, including the statements referenced herein from the Company's Annual 10-K Reports, which were signed by a majority of the Company's current Board members.

229. Further, defendants Shedlarz and Jacobson served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment

functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Audit Committee Charter. Thus, defendants Shedlarz and Jacobson breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

230. There is reason to doubt that Mr. Divita could respond independently to a demand because his principal professional occupation is his position as the Company's CEO. In connection with his role as the Company's CEO, Mr. Divita has received and continues to receive substantial monetary compensation and other valuable benefits. No reasonable stockholder would believe that Mr. Divita is capable of impartially considering a demand to commence and vigorously prosecute this action against those Individual Defendants who control his compensation, especially given that in the Company's most recent annual proxy statement on SEC Form DEF 14A, disseminated to stockholders on April 7, 2026, the Board has admitted that Mr. Divita is not an independent director.

**COUNT I**

**Against the Individual Defendants for Violations of § 14(a) of the Exchange Act and SEC Rule 14a-9**

231. Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

232. Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

233. The 2023 Proxy Statement violated Section 14(a) and Rule 14a-9 because it solicited Teladoc stockholder votes for, among other things, director reelection, while simultaneously misrepresenting and/or failing to disclose the Company's shortcomings.

234. The Individual Defendants made untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of Section 14(a) and Rule 14a-9. By virtue of their positions within the Company and roles in the process and in the preparation of the 2023 Proxy Statement, the Individual Defendants were aware of this information and of their duty to disclose this information in the 2023 Proxy Statement.

235. The Individual Defendants knew that the statements contained in the 2023 Proxy Statement were materially false and misleading.

236. The omissions and false and misleading statements in the 2023 Proxy Statement are material in that a reasonable stockholder would consider them important in deciding how to vote on the re-election of directors. Indeed, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the 2023 Proxy Statement and in other information reasonably available to stockholders.

237. As a direct and proximate result of the dissemination of the false and misleading 2023 Proxy Statement that the Individual Defendants used to obtain stockholder approval of and thereby re-elect directors, nominal defendant Teladoc suffered damage and actual economic losses (*i.e.*, wrongful re-election of directors) in an amount to be determined at trial.

**COUNT II**

**Breach of Fiduciary Duty Against the Individual Defendants**

238. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

239. The Individual Defendants, as current or former Teladoc officers and/or directors, owe (or owed) the Company the fiduciary duties of due care, loyalty, good faith, candor, oversight, reasonable inquiry, and supervision.

240. By virtue of their positions as Teladoc directors and/or officers, these Individual Defendants at all relevant times had the power to (and did) control, influence, and cause the Company to engage in the practices complained of herein, including the false and misleading statements alleged herein.

241. Each Individual Defendant was required to: (a) use his or her ability to control and manage Teladoc in a fair, just, and equitable manner; and (b) act in furtherance of the best interests of Teladoc rather than his or her own interests.

242. By their acts alleged herein, including but not limited to causing Teladoc to issue false and misleading statements while concealing material adverse information and failing to ensure that the Company maintained adequate internal controls regarding financial disclosures, the Individual Defendants each breached their fiduciary duties.

243. The Individual Defendants acted in bad faith, willfully, and/or recklessly in violating their fiduciary duties owed to the Company.

244. Teladoc has been injured as a direct and proximate result of the Individual Defendants' wrongful conduct.

**COUNT III**

**Against the Individual Defendants for Unjust Enrichment**

245. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

246. By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Teladoc.

247. Plaintiff, as a shareholder and representative of Teladoc, seeks restitution from the Individual Defendants, and each of them, and seeks an order of this Court disgorging all profits, salaries, benefits and other compensation obtained by these Individual Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

**COUNT IV**

**Against the Individual Defendants for Waste of Corporate Assets**

248. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

249. The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

250. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Teladoc to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

251. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

252. Plaintiff, on behalf of Teladoc, has no adequate remedy at law.

**COUNT V**

**Against the Individual Defendants for Gross Mismanagement**

253. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

254. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Teladoc in a manner consistent with the operations of a publicly held corporation.

255. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Teladoc has sustained and will continue to sustain significant damages.

256. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

257. Plaintiff, on behalf of Teladoc, has no adequate remedy at law.

**COUNT VI**

**Against the Individual Defendants for Abuse of Control**

258. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

259. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Teladoc, for which they are legally responsible.

260. As a direct and proximate result of the Individual Defendants' abuse of control, Teladoc has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

261. Plaintiff, on behalf of Teladoc, has no adequate remedy at law.

**COUNT VII**

**Against Defendants Gorevic and Murthy for Contribution Under Sections 10(b) and 21D of the Exchange Act**

262. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

263. This claim is brought derivatively on behalf of the Company for contribution and indemnification against defendants Gorevic and Murthy, each of whom is a named defendant in the Securities Action.

264. Teladoc is named as a defendant in the Securities Action, which asserts claims under the federal securities laws for, among other things, violation of §10(b) of the Exchange Act. If Teladoc is ultimately found liable for violating the federal securities laws, the Company's liability will arise, in whole or in part, from the intentional, knowing, or reckless acts or omissions of one or both of defendants Gorevic and Murthy, as alleged herein. The Company is entitled to receive contribution from those defendants in connection with the Securities Action against the Company.

265. As directors and/or officers of Teladoc, defendants Gorevic and Murthy had the power and/or ability to, and did, directly or indirectly control or influence the Company's business operations and financial affairs, including the content of public statements about Teladoc, and had the power and/or ability directly or indirectly to control or influence the specific corporate statements and conduct that violated §10(b) of the Exchange Act and SEC Rule 10b-5 as alleged above.

266. Defendants Gorevic and Murthy are also liable under §10(b) of the Exchange Act, 15 U.S.C. §78j(b), pursuant to which there is a private right of action for contribution, and §21D of the Exchange Act, 15 U.S.C. §78u-4, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

267. Accordingly, Teladoc is entitled to all appropriate contribution or indemnification from defendants Gorevic and Murthy, who are responsible for exposing Teladoc to liability under the federal securities laws.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A. Against all the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B. Directing Teladoc to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its stockholders holders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

C. Awarding to Teladoc restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

D. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

E. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Date: April 27, 2026

**BERNSTEIN LIEBHARD LLP**

/s/ Timothy J. MacFall
Stanley D. Bernstein
Timothy J. MacFall
10 E. 40th Street
New York, NY 10016
(212) 779-1414
bernstein@bernlieb.com
tmacfall@bernlieb.com

**SHUMAN, GLENN & STECKER**
Brett D. Stecker
326 W. Lancaster Avenue
Ardmore, PA 19003
(303) 861-3003
brett@shumanlawfirm.com

D. Seamus Kaskela
Adrienne Bell
**KASKELA LAW LLC**
18 Campus Blvd., Suite 110
Newtown Square, PA 19073
Telephone: 484-258-1585
Facsimile: 484-258-1585
skaskela@kaskelalaw.com

*Counsel for Plaintiff*

**Teladoc Health, Inc. Verification**

I, Travis Vrana, hereby verify that I am familiar with the allegations in the Verified Shareholder Derivative Complaint (the "Complaint"), and that I have authorized the filing of the Complaint, and that the foregoing is true and correct to the best of my knowledge, information and belief.

Date: 4/24/2026

Signed by:
Travis Vrana
25EFC7A032044EA...
TRAVIS VRANA